Filed 12/8/20  In re V.S. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re V.S. et al., Persons Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> VICTOR S. et. al., <br><br> Defendants and Appellants. | F081427 <br><br> (Super. Ct. Nos. JVDP-18-000027, JVDP-18-000028, JVDP-18-000029.) <br><br> **OPINION** |

### THE COURT[*]

APPEALS from orders of the Superior Court of Stanislaus County.  Margaret Johnson, Judge.  (Retired Judge of the Santa Clara Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

Elizabeth C. Alexander, under appointment by the Court of Appeal, for Defendant and Appellant Victor S.

Suzanne M. Nicholson, under appointment by the Court of Appeal, for Defendant and Appellant S.B.

---

[*]    Before Detjen, Acting P.J., Franson, J. and Smith, J.

Thomas E. Boze, County Counsel, and Maria Elena Ratliff, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

S.B. (mother) appeals from a Welfare and Institutions Code section 366.26[1] hearing order terminating her parental rights to her three children. Mother contends there was insufficient evidence for the juvenile court to find her children, V.S., F.S., and J.S. were adoptable within a reasonable time. Victor S. (father) does not raise any independent arguments but joins mother's argument. We affirm.

## SUMMARY OF FACTS AND PROCEDURE

The Stanislaus County Community Services Agency (agency) received a referral on May 15, 2018, that mother, father and the three children were living out of a car in the parking lot of a nursing and rehabilitation facility (facility). Mother appeared to be developmentally delayed and seriously overweight, making her physically and mentally unable to care for the children. Mother initially said she was not the children's mother and that they were not living out of the vehicle, but that they were living with an aunt, although she could provide no further information. She then admitted she was the children's mother, and that father left early that morning with the third child and she had no way to contact him. Mother reported she was not able to care for the children and relied on father to help her at all times. The vehicle was unsanitary with trash and dirty diapers.

Mother reported that she and father had previously had another child removed from their care in Arizona for these same reasons. They did not reunify with the child and she was placed for adoption.

---

**1** All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

2.

It was learned that the family was staying at the parking lot of the facility because mother's aunt, who was also father's wife (hereafter aunt/wife), was being treated in the facility. The family had been living with the aunt/wife but were evicted the previous month. The facility had been feeding the children for the past four days.

The social worker at the facility reported that the children had been wearing the same clothing for four days, as the parents did not have a change of clothing for them. The facility had been feeding the children meals, brought them into the facility for baths, and purchased new clothing and shoes for the children, and provided them blankets at night. The social worker noted that father leaves the children with mother in the parking lot for most of the day. While facility staff suggested she take the children to the park or bring them into the facility to get them out of the heat, mother refused.

Mother also refused to go to the Gospel Mission, stating she had been kicked out of there before and they would not let her be there with father. She also declined to seek emergency housing, as they would not allow father to live with her.

Mother reported that she was diagnosed with attention deficit hyperactivity disorder (ADHD) and depression but did not take medication. She self-medicated with marijuana and tested positive for such.

Mother reported that two-year-old J.S. had been diagnosed with delays and remained non-verbal, but she had not obtained any services for her. Four-year-old F.S. reported that mother and father fought by hitting each other with kicks and punches. Six-year-old V.S. reported being scared that mother, father and his "stepmother" were going to have a big fight because the children were going to be taken away.

Father returned mid-afternoon and reported that he wanted to stay in the parking lot as it was closer to aunt/wife in the facility. He refused to consider services at the Gospel Mission, Crisis Center, or the welfare department. While he acknowledged that the children needed a safe place to stay, he refused to leave the parking lot. Mother

3.

stated that leaving the parking lot would give the aunt/wife a "heart attack." Father confirmed that mother was unable to care for the children due to her disabilities.

*Detention*

The children were detained and a section 300 petition filed alleging failure to provide basic needs, substance abuse, domestic violence, mother's mental and physical disabilities, failure to address J.S.'s delays, father's criminal record, and the failure of mother and father to reunify with the children's sibling, A.B., who was removed in Arizona in 2006.

The report prepared for detention reflected 11 previous referrals regarding the family, beginning in 2013. There was also a referral in 2000 when mother, then age 15, disclosed that she and her uncle (father) had had a sexual relationship when she and her mother lived together with aunt/wife and uncle (father).

Father, who had a criminal history reflecting 14 aliases, had convictions for theft, burglary, battery, and infliction of corporal injury on a spouse. He was deported "voluntary[ily]" to Mexico in October 1993, a week after a conviction for battery and theft.

On May 21, 2018, with mother's consent, the juvenile court appointed a guardian ad litem for mother. The minors were ordered detained and jurisdiction/disposition set for June 22, 2018.

*Jurisdiction/Disposition*

The report for the jurisdiction/disposition hearing recommended that the children be detained and mother and father provided services. The report included the referral from Arizona, which indicated that mother, then aged 21, was under a guardianship, due to her developmental delays. Her mother, maternal grandmother, was her guardian. Mother, who had given birth to A.B., was deemed unable to care for the child due to her disabilities. The alleged father was father, who was married to aunt/wife. It was found that mother was unable to give consent to the sexual contact with father, and father and

4.

aunt/wife were ordered not to have contact with mother and the baby. Mother was provided reunification services, but unable to learn parenting skills. Father was eventually also provided services, along with aunt/wife.

During the course of the previous dependency case, maternal grandmother passed away. Mother was in California at the time, where she remained. Father and aunt/wife returned to California and mother began living with them.

During the previous case, mother disclosed that father had begun fondling her when she was 12 years old and told her this was acceptable as girls in Mexico had sex with older men at that age. Mother also reported that aunt/wife touched her inappropriately.

In the current situation, the report indicated that V.S. was experiencing worry and anxiety over the family's situation and he had concern for his parents. He was constantly seeking food at school.

On July 6, 2018, the petition was found true and the children removed from parental custody. A six-month review hearing was set for December 20, 2018.

*Six-Month Review*

The agency report for the six-month review recommended that the children remain in foster care and that both mother and father receive an additional six months of services. In June of 2018, aunt/wife died and father and mother married each other in September 2018. They remained homeless.

Mother was participating in services, but due to her difficulties, was proceeding very slowly. Father was participating in services and it was recommended that he participate in sexual abuse counseling. Father denied having sexual relations with mother as a minor, despite documentation to the contrary. Father explained that his wife (aunt/wife) was unable to have children and she was the one who suggested he have the relationship with mother. Aunt/wife was also jealous of this relationship and they would

5.

argue. When mother would attempt to hit aunt/wife, he would defend aunt/wife, which led to his arrest on one occasion.

An addendum report was filed stating that mother had completed her clinical assessment and it recommended that she attend one-on-one domestic counseling. Additional therapy to address the topic of codependency was recommended, as well as a psychological evaluation.

Mother and father attended J.S.'s assessment, but they played with her the entire time and gave her their telephone, making an assessment impossible. A second assessment was scheduled, and the parents ordered to attend and not bring the phone.

V.S. was diagnosed with ADHD and it was recommended that he begin ADHD medication.

While both mother and father were participating in services, neither took responsibility for the actions that led to the dependency, blaming instead the agency or the facility.

At the rescheduled hearing on March 12, 2019, the juvenile court found that reasonable services had been offered and adopted the recommendation of the agency to provide mother and father with an additional six months of services. A parent partner was provided to assist mother and father in mentoring/education, housing and job search. Mother and father were to meet with the parent partner three times a month. Mother was also to participate in a psychological evaluation to determine if the case plan could be further tailored to her needs. If the evaluator determined that mother could not benefit from reunification services due to a mental disability, a second psychological evaluation would be completed to address the issue.

A 12-month hearing was scheduled for June 25, 2019.

*Twelve-Month Review*

The agency report for the 12-month review recommended that services be terminated, and a section 366.26 hearing be set, with a permanent plan of adoption for the children.

J.S. was found to be eligible for regional center services and referred to Head Start.

Mother had attended counseling sessions focused on developing coping skills, domestic violence, codependency and managing stress and anger. The therapist relayed that mother had difficulty retaining information and continued to blame the social workers and other care providers for being unable to help her. She made little progress in her parenting classes.

Mother's parent partner reported that mother appeared receptive to new parenting techniques when the parent partner was present but reverted to old habits when the parent partner left the room. Father was not open to suggestions and insisted that he knew what was best for the children.

A psychological evaluation done in April 2019, reported that mother was diagnosed with "Intellectual Disability - Moderate and Personality Disorder NOS with Avoidant and Dependent Features." The therapist opined that mother would not be able to develop adequate skills to parent her children.

At a contested hearing July 29, 2019, the juvenile court continued services for both mother and father and directed that an amended plan be added in consultation with the regional center to determine if there were services that could help mother. A second psychological examination was ordered for mother. An 18-month review was scheduled for November 8, 2019.

*Section 388 Petition*

An August 20, 2019 section 388 petition filed by the agency was granted, allowing the educational rights of the children be shared between the new caregivers and mother and father.

*Eighteen-Month Hearing*

By the time of the section 18-month review, mother had completed her second psychological evaluation. While the psychologist had not finished the report, she verbally agreed with the first psychologist that mother, due to her intellectual disability, was unable to learn and integrate new information. Mother did not understand that her children were in danger. Various alternate services were offered and attempted with mother, but she did not want and was resistant to assistance.

Mother insisted that V.S. was aggressive during visits and she needed to spank him to make him listen. Mother was not open to suggestions for alternatives to disciplining V.S. and she did not like working with the parent partner and did not like having supervised visits. Father had completed some of the domestic violence classes but insisted that he was not guilty of what he was "accused of."

The visits were determined to be detrimental to the children as the children exhibited various concerning behaviors before and after the visits. It was requested by the agency that the visits be suspended.

A contested hearing was set for December 13, 2019. Prior to the hearing, the agency filed a letter indicating that all three children were receiving services from a program involving individual therapy and rehabilitation support, as well as case management and parent support with the "guardians."

The completed second psychological report was attached, indicating that mother's impulse control was very poor, her intellectual function severely impaired, and her remote memory, judgment and insight very poor. The report indicated that mother was

8.

unaware of her role in creating the chaos in her family and there were no services that could improve her potential for success in parenting her children.

While father had completed his domestic violence counseling, he was found to be in need of improvement in the fundamental knowledge that using threats, intimidation, or violence was unacceptable. While father was not now denying use of violence in his relationship with mother, he was now justifying it to control her.

An observed visit described mother and V.S. yelling at each other, V.S. refusing to listen to mother, and mother ignoring him. Mother then attempted to give V.S. a time out, which involved more shouting and eventually mother physically carrying V.S. to a corner with more shouting.

At the December 13, 2019, hearing, services were terminated and visits reduced to one a month. Mother and father's education rights were suspended and assigned solely to the caregivers. A section 366.26 hearing was set for April 13, 2020.

*Section 366.26 Hearing*

The agency report filed for the section 366.26 hearing recommended that mother and father's parental rights be terminated and adoption be established for the children with their current caregivers.

The report assessed each child. V.S., now age eight, was in good health, but displayed traits of autism. He qualified for speech therapy. He had not begun his ADHD medication as the caregiver had not received the prescription yet. V.S. was reported not to need the medication at home, only at school.

F.S., now age six, was in good health, developing normally, and qualified for speech therapy. He was receiving mental health counseling.

J.S., now age four, was healthy, was a regional center client receiving case management services and mental health support and was set to begin speech therapy.

The report indicated that the children were "certain" to be adopted by their current caregivers "if given the opportunity to do so." The children had been placed in their

9.

current caregiver's home in early August 2019. The family had adopted another child in 2013, and the father in the home had been a stay-at-home dad ever since, taking occasional side jobs. The mother worked in the medical field. The family had been cleared through the Resource Family Approval program. The report indicated that the caregiver family had demonstrated their capability to care for the children's needs and the children enjoyed the attention of the caregivers.

V.S. reported that he wished to be adopted. F.S. stated that he wished to reunify with mother and father, but if that was not possible, to stay with the caregivers. J.S. was too young to understand the concept of adoption.

The children were all reported to be doing well in the caregivers' home and had established a strong bond with them. They had adjusted to the structure and routine, including homework time, chores, bedtime, family and individual time. The caregivers had worked closely with the school to get the support they needed. All children were continuing to work through "some behaviors."

The caregivers submitted detailed information on each child. They reported that V.S. had been recently tested for asthma but was otherwise healthy. While he continued to have significant emotional struggles at school he did not at home. The caregivers reported that, after each visit with mother and father, V.S. exhibited parentified behavior and the younger children then look to him for direction. His speech issues were improving, and he was doing well in-home schooling due to COVID-19. He was learning to trust the caregivers to provide him with what he needed. He had recently started piano lessons, which he enjoyed.

The caregivers reported that F.S. still struggled emotionally but was learning that it was okay to cry. He vomited before and after visits with mother and father and the caregivers reported numerous ailments requiring attention. Both the caregivers and his teacher identified areas that caused him anxiety. His individualized education plan (IEP) was postponed due to COVID-19. They are pursuing additional help with his speech.

10.

The caregivers reported that J.S. was physically healthy and now toilet trained. She still struggled with food insecurity and was initially overeating. She becomes obsessed with food after visits with mother and father, as well as exhibiting separation anxiety. The caregivers were working on alleviating her anxiety. She did not speak when initially placed with the caregivers, but she was now beginning to speak and sing.

The section 366.26 hearing was rescheduled to June 25, 2020, due to COVID-19.

In an additional report, the agency stated that all three children had been found eligible for an IEP in speech services.

The hearing was again trailed to July 14, 2020. At that time, the agency submitted on the reports; mother testified briefly on the visits with the children; and father's counsel made an offer of proof that he loves his children and has a strong bond with them, and believes they would suffer if his parental rights were terminated. Counsel for the agency noted that the children had been with the current caregivers for almost a year and had been out of home placement for almost two years.

Counsel for both parents argued that the beneficial parent child exception to adoption applied. Counsel for mother specifically argued there was no clear and convincing evidence that the children were likely to be adopted, as the "problems" discussed by the caregivers evidenced doubt on their willingness to adopt the children. Counsel for the children disagreed, as did counsel for the agency, who argued that the detailed information given by the caregivers showed how involved they were with the children and showed the progress they had made, to the point that the children now "allowed themselves" to call the caregivers mom and dad.

The juvenile court found by clear and convincing evidence that the children were adoptable and that it would not be detrimental to terminate mother and father's parental rights. Parental rights were terminated, and this appeal followed.

11.

## DISCUSSION

Mother argues that the record does not contain substantial evidence establishing the children were likely to be adopted. More specifically, she asserts that the evidence was insufficient to show the children were either generally or specifically adoptable. The argument lacks merit.

If the juvenile court finds clear and convincing evidence that it is likely a dependent child will be adopted, the court shall terminate parental rights and order the child placed for adoption (unless an exception applies). (§ 366.26, subd. (c)(1).) The clear and convincing evidence standard "requires a finding of high probability." (*In re Angelia P.* (1981) 28 Cal.3d 908, 919.) "A child's young age, good physical and emotional health, intellectual growth and ability to develop interpersonal relationships are all attributes indicating adoptability." (*In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1562.) It is not necessary that the child already be in a preadoptive home or with a caregiver who is prepared to adopt. (§ 366.26, subd. (c)(1); *In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.) Nevertheless, the caregiver's "willingness to adopt generally indicates the [child] is likely to be adopted within a reasonable time either by the [foster] parent *or by some other family.*" (*In re Sarah M., supra,* at p. 1650.)

Some courts have distinguished between generally and specifically adoptable children. General adoptability refers to cases in which the child's personal characteristics are sufficiently appealing that it is likely the child will be adopted within a reasonable time. (*In re R.C.* (2008) 169 Cal.App.4th 486, 493.) Specific adoptability refers to "unusual cases where a child, due to severe physical or mental needs, may be deemed adoptable based solely on the fact that a particular family wants to adopt the child." (*In re Mary C.* (2020) 48 Cal.App.5th 793, 802, fn. 5.) In such cases, the court must determine if there is a legal impediment to adoption. (*Ibid.*)

But the juvenile court is not required to find the child " 'generally' or 'specifically' adoptable." (*In re Mary C., supra,* 48 Cal.App.5th at p. 802.) Section

12.

366.26 does not speak in terms of general or specific adoptability. Nor does the law require the agency's assessment to include evidence of general or specific adoptability— the agency must merely analyze "the likelihood that the child will be adopted." (§§ 366.21, subd. (i)(1)(G), 366.22, subd. (c)(1)(F).) Moreover, "[a]lthough a finding of adoptability must be supported by clear and convincing evidence, it is nevertheless a low threshold: The court must merely determine that it is 'likely' that the child will be adopted within a reasonable time." (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292.)

Our review accounts for the heightened standard of proof in the trial court. We must determine "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable" that the children were likely to be adopted. (*Conservatorship of the Person of O.B.* (2020) 9 Cal.5th 989, 996–997.) But we do not reweigh the evidence. (*Id.* at p. 1008.) We "view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.* at p. 996; accord *In re R.C., supra,* 169 Cal.App.4th at p. 491 ["We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence"].)

Mother contends the children were not generally adoptable due to their various emotional, physical and behavioral issues. During the dependency, V.S. was diagnosed with ADHD and possible autism traits. His issues had caused him to be held back in the first grade. He struggled emotionally and displayed symptoms of extreme anxiety. F.S. required speech therapy services. And J.S. had significant language impairment and adaptive functions below her age. Her emotional health was of concern and she suffered from food anxiety. The children all required individual therapy and rehabilitation support services. Mother contends these issues have made her children ineligible for a finding of adoptability.

13.

Mother cites several cases in which an appellate court has reversed a termination of parental rights for insufficient evidence based on deficient evidence of adoptability. *In re Asia L.* (2003) 107 Cal.App.4th 498 involved two extremely hyperactive children who needed "specialized placement," where a prospective adoptive family had not been identified. (*Id.* at p. 511.) *In re Jerome D.* (2000) 84 Cal.App.4th 1200, involved a child with a prosthetic eye whose prospective adoptive parent had a criminal history of domestic violence and was listed as a perpetrator by Child Protective Services for emotionally abusing his nephews and niece. (*Id.* at p. 1203.) The case also involved the beneficial parental relationship exception to termination of parental rights, where the child's attorney agreed with the mother that parental rights should not be terminated. (*Id.* at pp. 1206–1207.) Neither case supports mother's argument here.

And none of the children here exhibited problems even remotely close to the problems experienced by the minor in *In re Carl R.* (2005) 128 Cal.App.4th 1051, which gave rise to the concept of "specific" adoptability. In that case, the minor at issue had cerebral palsy, severe quadriparesis, a seizure disorder, and an uncontrolled and severe psychomotor delay and required intensive care for life. (*Id.* at pp. 1061–1062.)

In this case, there was substantial evidence from which a reasonable factfinder could conclude that it was highly probable the children were likely to be adopted. All three were quite young. The caregivers, who had had the children in their home for almost a year at the time of the section 366.26 hearing, described the children as physically healthy. V.S. was described as very intelligent and well-liked by his classmates; F.S. as friendly, kind and tender-hearted; and J.S. as friendly with family and friends she is familiar with. It is true that, in addition to those positive attributes, all three children had some difficulties: all three children had speech and food issues related to the environments they endured as small children. V.S. had some behavioral problems at school, but those were not exhibited in the caregiver's home.

Mother also contends the children were not generally adoptable because it is not clear that the current caregivers were really committed to adopting the children, thus casting doubt on the likelihood that the children would be adopted. Mother points to the statement by the caregiver mother that they would be "honored" to be called "mom and dad" as somehow showing less than full commitment by the caregiver father and only lukewarm commitment by mother. We find this speculative. The very thorough statements by the caregivers, chronicling in detail each of the children, their issues, and what the caregivers were doing to alleviate those issues, showed the caregivers were extremely committed to the children, and that the children were likely to be adopted.

Mother also contends the caregiver's reluctance to adopt the children is evident from the fact that they had not, as yet, been designated as prospective adoptive parents, as described in section 366.26, subdivision (n)(1).[2] However, there is no legal requirement that the caregivers complete the requirements of section 366.26, subdivision (n)(1) before a juvenile court can terminate parental rights. The question before the juvenile court was whether the children were likely to be adopted within a reasonable time, not whether any particular adoptive parents were suitable. The issue of a potential family's suitability to adopt is reserved for a subsequent adoption proceeding. (*In re Marina S.* (2005) 132 Cal.App.4th 158, 166, citing *In re Scott M.* (1993) 13 Cal.App.4th 839, 844.)

"The issue of adoptability posed in a section 366.26 hearing focuses on the *minor*, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor. [Citations.] Hence, it is not necessary that the minor already be in a potential adoptive home or that there be a proposed adoptive parent

---

[2] Section 366.26, subdivision (n)(1) provides that a court may, at any time during or after the section 366.26 hearing, designate a current caregiver as a prospective adoptive parent if the child has lived with the caregiver for at least six months, expressed a commitment to adopt, and taken "at least one step" to facilitate the adoption process, such as, but not limited to, applying for an adoption home study, requesting de facto parent status, or signing an adoptive placement agreement. (§ 366.26, subd. (n)(2)(A)–(H).)

'waiting in the wings.' " (*In re Sarah M., supra,* 22 Cal.App.4th at p. 1649.) There being no requirement of a potential adoptive parent at all to establish general adoptability, mother correspondingly has no right to challenge the caregiver's suitability (*id.* at pp. 1649–1650; *In re Scott M., supra,* 13 Cal.App.4th at p. 844), for even if the caregiver's suitability should prove to be unsuitable, the finding that the children are "likely to be adopted" incorporates a finding that another willing adoptive parent is likely to be found.

We find substantial evidence that the children's positive attributes and the presence of a caregiver committed to adoption constituted substantial evidence of the likelihood of adoption and reject mother's claim to the contrary. (See *In re Mary C., supra,* 48 Cal.App.5th at pp. 802–805 [substantial evidence supported adoptability of children with developmental delays, behavioral issues, and emotional difficulties, given that they were " 'young, sweet, and engaging,' " they could form loving and trusting relationships, and foster family wanted to adopt them]; *In re A.A.* (2008) 167 Cal.App.4th 1292, 1312–1313 [substantial evidence that children were likely to be adopted, given that they were young, bright, and making progress in addressing behavioral and emotional problems, and caregivers were committed to adoption].)

## DISPOSITION

The orders of the juvenile court finding the children adoptable and terminating parental rights are affirmed.